IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MATTHEW W. MARTIN,                )
                                  )
            Plaintiff,            )
                                  )     No.    04 C 4334
      v.                          )
                                  )     Judge Robert W. Gettleman
DELOITTE & TOUCHE LLP,            )
                                  )
            Defendant.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff Matthew Martin, an African American, filed a complaint against his former employer, defendant Deloitte & Touche LLP, alleging that he was not promoted and constructively discharged because of his race, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq. Defendant has moved for summary judgment under Fed. R. Civ. P. 56, arguing that plaintiff has failed to establish a prima facie case of discrimination and has failed to rebut defendant's asserted non-discriminatory reason for terminating plaintiff's employment. For the reasons stated below, defendant's motion for summary judgment is granted.

## STATEMENT OF FACTS[1]

Defendant is an international professional services firm, with an office in Chicago, Illinois. Plaintiff worked as an associate in defendant's Chicago office from August 13, 2001, until he resigned in September 2003. Plaintiff was hired as part of a "class" of 17 associates. Plaintiff was one of two African Americans in his class. Several practice groups or areas were clustered under defendant's Chicago financial advisory services ("FAS") practice during the

---

[1] Unless otherwise noted, the following facts, taken from the parties' L.R. 56.1 statements and attached exhibits, are not in dispute.

period for 2001 through 2003. Associates work in certain practice areas, but are not dedicated to a particular area. Defendant's Chicago office has a staffing coordinator who matches associates with available work, but associates bear the responsibility for seeking out work for themselves when their schedules are slow. Each associate is assigned a "counselor," usually a senior manager, who acts as a quasi-mentor. Counselors meet with their associates periodically, assess their career paths, gather feedback from the associates' supervisors, and address associates' concerns. Pamela Stennes ("Stennes"), a senior manager, was assigned to be plaintiff's counselor.

Defendant calculates the "utilization" of each of its associates. "Client service hours" are considered professional hours worked that may be charged to clients. Utilization is an employee's client service hours divided by his total hours possible, including vacation, sick days, and non-chargeable work. During the period from 2001 through 2003, the goal for each associate was to be 85% utilized. An annual evaluation committee ("Committee") is convened in June to evaluate associates and determine promotions. Each associate's counselor makes a brief presentation to the Committee regarding the associate, recommends a ranking, and opines whether the associate should be promoted to senior associate. The counselor's remarks are based primarily on feedback the counselor has received from the associate's supervisors. Following the counselor's presentation, the Committee reaches a consensus decision regarding the associate's ranking and promotion. The opinions of partners generally carry more weight in the Committee's discussion and final decision than others' opinions.

Plaintiff spent most of his first year in the Intangible Asset Management ("IAM") practice area within FAS, working on a project for the University of Illinois. Plaintiff's supervisors

2

ranked him as "on track" during his first mid-year review, although his utilization was only 29%, in part because his supervisors asked him to record some of his hours as non-billable practice development time. During his first year, Stennes told plaintiff that his utilization was "low" and that he "might want to consider" looking for work outside the IAM group. Stennes suggested that he talk to the staffing coordinator about other assignments. Plaintiff admits that he did not seek additional work. At the conclusion of his first year, plaintiff's supervisors did not recommend his promotion to senior associate, telling Stennes that plaintiff's work was "fine," but that he needed more experience and time spent with clients. Accordingly, Stennes did not recommend to the Committee that plaintiff be promoted. Plaintiff's salary was raised from $80,000 to $83,000 or $84,0000.

At the beginning of plaintiff's second year with defendant, Phillip Banks ("Banks"), the senior manager in charge of the Security Management Solutions ("SMS") practice, invited plaintiff to work with SMS. SMS was a small, start-up concern. Reed White ("White") was the manager of SMS. Both White and Banks are white. During early 2003, Stennes again told plaintiff that she was concerned about his low utilization. According to plaintiff, Stennes told him, "[I]f I was you, I would look around" for work outside of SMS, but she "never framed it as jeopardizing [his] career" and did not "instruct" him to start looking for work outside SMS.[2] Plaintiff did not seek work outside SMS. His utilization rate for fiscal year 2003 was 19%, the

---

[2]The court notes that plaintiff states in his L.R. 56.1 statement that "Stennes did not discuss utilization with [plaintiff] until late 2003," citing a portion of Stennes's deposition in support. Plaintiff testified at his deposition, however, that he spoke with Stennes about utilization in early 2003, and the portion of Stennes's deposition cited by plaintiff refers to a separate discussion with Stennes after the Committee meeting in June 2003. Stennes also testified that she had previously spoken to plaintiff about his utilization.

3

lowest in his associate class. The next lowest associate had a 48% utilization in 2003.

In April or May 2003, Gregory Swinehart ("Swinehart") became the regional managing partner for the FAS practice. According to defendant, Swinehart focused more on chargeable hours and utilization than his predecessor. Plaintiff does not challenge this assertion, but states that defendant's documents do not indicate a formal change in philosophy or emphasis concerning the use of utilization in year-end evaluation. By mid-2003, the SMS practice was slated to be phased out by defendant. Defendant terminated Banks and White, the senior professionals in SMS, during the summer of 2003.

According to defendant, Stennes advised plaintiff prior to the 2003 Committee meeting that she was recommending him for promotion, but that it was not "a slam drunk" because of his low utilization. Stennes recommended to the 2003 Committee that plaintiff be promoted. Plaintiff asserts that Stennes gave him an overall year-end rating of "2," with "1" being the highest. Stennes testified that she could not recall if her initial recommendation was a "2" or a "3," but that she remembers entering the Committee meeting with a particular rating that the Committee thought was too high. Stennes's notes taken during the Committee meeting indicate a "3" rating for plaintiff. Stennes stated that after listening to the Committee she agreed that plaintiff's rating should be lower than she initially opined. The Committee decided at its June 12, 2003, meeting not to promote plaintiff.

Stennes testified that plaintiff lacked experience on "paying client engagements," which was "the type of experience [Swinehart] was looking for." According to Stennes, Swinehart noted at the Committee meeting that plaintiff's utilization was "extremely low" and that SMS was likely to be phased out. Three other associates from plaintiff's class, two white and one

4

Asian, were also not promoted by the 2003 Committee. Three different associates - Jill Lacombe ("Lacombe"), Ravi Thakkar ("Thakkar"), and David Shellberg ("Shellberg") - received year-end ratings of "3" and were recommended for promotion in 2003. In 2003, Lacombe's utilization was 48%, Thakkar's was 97%, and Shellberg's was 79%.

Plaintiff was not terminated when SMS was phased out and its managers terminated, and he was placed in the valuation practice. After the Committee meeting, plaintiff met with Nicole Moffett ("Moffett"), defendant's human resources manager, who indicated that plaintiff was well-liked and that defendant wanted him to stay on. Plaintiff replied that he wanted to stay. Defendant raised plaintiff's salary to $89,000. Plaintiff was assigned to a project for MCI in Mississippi, and he reported for work there. Shortly thereafter, plaintiff made an internal complaint to Moffett, alleging that defendant's decision not to promote him was racially motivated. Plaintiff's complaint was assigned to Michele Sommers ("Sommers") in defendant's human resources department for investigation. Sommers and plaintiff agreed that plaintiff did not have to work while Sommers's investigation was in progress. Sommers concluded that plaintiff's race complaint lacked merit. According to plaintiff, Sommers told him in early September 2003 that "you can either return back to work or I'm taking it as your resignation if you don't." Plaintiff did not return to work except to drop off his computer on September 11, 2003.

In August 2003, plaintiff applied for a job with Unilever, indicating his availability as of September 1, 2003. Unilever extended an offer to plaintiff on August 26, 2003, which plaintiff accepted on September 10, 2003. On September 26, 2003, plaintiff's attorney sent a letter of resignation on plaintiff's behalf. Plaintiff began working at Unilever in late September 2003.

On December 15, 2003, plaintiff filed a race discrimination charge against defendant with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a right to sue notice on March 31, 2004, and timely filed the instant action on June 29, 2004.

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. See Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's]

6

position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

## DISCUSSION

Plaintiff has not produced direct evidence that defendant discriminated against him because of his race. Accordingly, to establish his prima facie case of discrimination with respect to his termination, plaintiff must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the class were treated more favorably. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002). Once plaintiff has met his burden, the employer must then produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. If the employer offers such a reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is a pretext. Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 394 (7th Cir. 1998).

In the instant case, defendant argues that plaintiff has not satisfied the second and fourth prongs of the prima facie case. Defendant points to plaintiff's 19% utilization as evidence that he was not meeting his employer's legitimate expectations, and argues that plaintiff has failed to identify employees with similarly low utilization who worked in the same practice area as plaintiff. The court need not address defendant's attacks on plaintiff's prima facie case, however, because plaintiff has failed to create a triable issue of material fact that defendant's proffered reasons for his non-promotion were pretextual.

A plaintiff can establish pretext by showing either that a discriminatory reason more

7

likely motivated the employer or that the employer's proffered explanation is unworthy of credence. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1039 (7th Cir. 1993). Plaintiff must demonstrate that the explanation is dishonest, rather than merely an error. Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002) (citing Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000)). "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." Grube v. Lau Industries, Inc., 257 F.3d 723, 730 (7th Cir.2001) (internal quotations omitted). Ultimately the question is not whether the employer's decision was correct, but rather whether the employer's explanations for its decision are honest. Dvorak v. Mostardi Platt Associates, 289 F.3d 479, 487 (7th Cir. 2002).

Defendant identifies two primary reasons for plaintiff's non-promotion, his extremely low utilization and the phasing out of SMS. Plaintiff does not contradict either his 19% utilization, which was less than one-quarter of defendant's 85% utilization goal, or that it was lowest in his associate class by a significant margin. Plaintiff also concedes that SMS was ended and its managers terminated in the second half of 2003. Plaintiff argues that the Committee, and Swinehart in particular, over-emphasized the important of utilization in violation of defendant's "guidelines" for year-end evaluations, and that the emphasis was new and its timing was "suspicious." Defendant's memoranda outlining the year-end evaluation process, however, include utilization as a element of an associate's ratings without specifying the weight to be given to any one factor or establishing a rigid minimum rating for promotion. Plaintiff admits that the opinions of partners like Swinehart carry more weight in Committee meetings, and does not challenge defendant's assertion that Swinehart, the new managing partner of FAS, thought

8

utilization was a critical category and expressed his concerns regarding plaintiff's low utilization at the Committee meeting.

Plaintiff points to the promotion of Lacombe, Shellberg, and Thakkar, who are not African American and were promoted in 2003 with ratings of "3," as evidence of pretext. Plaintiff asserts that his ratings were higher than these associates in certain evaluation categories, such as management effectiveness and specialized technical knowledge. None of the three, however, had utilization rates even close to plaintiff's meager rate. Lacombe, the next lowest associate in plaintiff's class, had a utilization of 48%. Shellberg's utilization was 79% and Thakkar's was 97%. In addition, unlike plaintiff, these three associates did not work primarily in the SMS practice, which was slated for elimination by defendant at the time of the 2003 Committee meeting.

Plaintiff argues that he was "purposely set-up by his managers when he [was] instructed to record his client billable time as practice development" while working on certain projects, and was assured by managers "not to worry" that his low utilization score would hurt him at promotion time. Although "being set up to fail is a perfectly good theory of discrimination," Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 746 (7th Cir. 2002), it is defeated by the undisputed material facts in the instant case. Plaintiff admits that FAS associates are not dedicated to particular practice areas, that he voluntarily began working for SMS at the beginning of his second year, and that SMS was ultimately closed and its two senior managers terminated. Plaintiff also does not challenge defendant's assertion that he was free at all times to seek work in other areas, as Stennes repeatedly suggested that he do, and plaintiff does not assert that he sought work in other areas but was unable to find any. As defendant points out, one of the "harsh

9

realities" of big firm life is that "choosing to work exclusively in a small, ultimately doomed start-up service area without a significant clientele can be risky business."

Plaintiff testified that he did "all this great work" that was not reflected in his utilization, and that his other positive qualities were given short shrift. Plaintiff, however, presents no specific examples of work that was not properly considered or work that he was instructed not to record as client billable time, or that his utilization was otherwise miscalculated to create a pretext for non-promotion. Plaintiff also asserts in an affidavit that compared to Thakkar, Lacombe, and Shellberg, he was "either equally qualified for promotion to senior associate or more qualified." To defeat a motion for summary judgment a plaintiff "must do more than challenge the judgment of his superiors through his own self-interested assertions." Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986); see also Rabinowitz v. Pena, 89 F.3d 482, 487 (7th Cir. 1996) (self-serving opinions do not create a triable issue of material fact).

Plaintiff's pretext argument is further undermined by the undisputed fact that three non-African American members of plaintiff's class were also not promoted in 2003. Plaintiff states in his affidavit that it is his "understanding" that these three associates were recommended for promotion but declined in order to accept reassigned positions with a particular practice area. Plaintiff does not state the basis for his understanding or present any evidence in support of this assertion, and thus does not create a disputed fact whether he was the only associate not offered a promotion.

Plaintiff has failed to present any evidence of deceit, or that defendant's explanation for his non-promotion were manufactured to cover its tracks. Cf. Ryan v. Robert Bosch Corp., 2004 WL 2106608, at *6 (N.D.Ill. Sep. 20, 2004) (plaintiff presented court with more than "grand

conspiracy theories" and questions about defendant's business judgment). Plaintiff also fails to present any evidence that Swinehart, Stennes, or others on the Committee did not believe the stated reasons for plaintiff's non-promotion. See Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000) ("[S]o long as [the employer] honestly believes [its proffered] reasons, pretext has not been shown."). Plaintiff's disagreement with the Committee's subjective decision not to promote him or his disagreement with the relative importance assigned to certain evaluation criteria does not create a triable issue of material fact whether defendant's proffered reasons were mere pretext for race discrimination. Traylor v. Brown, 295 F.3d 783, 790 (7th Cir. 2002) (a court shall not "sit as a super-personnel department over employers scrutinizing and second-guessing every decision they make."). Plaintiff argues that it was "unreasonable for Swinehart to ignore plaintiff's exemplary overall evaluation" and not to investigate why plaintiff's practice development hours, as opposed to client service hours, were so much higher than other associates. Plaintiff is asking the court to do precisely what the Seventh Circuit has repeatedly admonished it to avoid. Id. Accordingly, defendant's motion got summary judgment of the Title VII claim is granted.

Although the complaint does not clearly state a separate constructive discharge claim, plaintiff argues that he was constructively discharged after non-promotion when he was "internally shopped" and denied a permanent assignment, despite his two years of experience and advanced education. According to plaintiff, "This situation was not tolerable and any professional African American man in plaintiff's position would also reasonably believe that he had been unjustly professionally abused and mistreated." Defendant admits that plaintiff was not permanently assigned, but denies without contradiction that it permanently assigns FAS

11

associates. Defendant also denies that it had an "up or out" policy, and plaintiff fails to present any evidence to the contrary.

The Seventh Circuit has held that to establish constructive discharge, a plaintiff "must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that [his] resignation was a appropriate response." Herron v. DaimlerChrysler Corp., 388 F.3d 293, 303 (7th Cir. 2004). In the instant case, plaintiff has presented no evidence that he was subject to an abusive working environment prior to his resignation, or that any agent of defendant ever suggested that he might be fired in the near future. In fact, plaintiff concedes that after he was not promoted he was given a raise and assigned to work on new projects. Plaintiff also admits that after his non-promotion, Moffett assured him that "everybody liked him" and that defendant wanted him to stay on. Cf. Hunt v. City of Markham, Illinois, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is repeatedly told that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with his employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable."). An employee's feelings that he was slighted and not valued by his employer do not constitute an intolerable or abusive working environment.

Accordingly, defendant's motion for summary judgment of the constructive discharge claim is granted.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted.

ENTER: November 16, 2005

_____
Robert W. Gettleman
United States District Judge